## Commonwealth v. Goodley

*William Chadwick*, for plaintiff.
*Richard McDaniels*, for defendant.

GUARINO, *J.*, October 4, 1978—Defendant is charged with (a) burglary, (b) robbery, (c) rape, and (d) possession of an instrument of a crime. He has filed a motion to suppress which was assigned to be heard at time of trial. A hearing on this motion was held before the undersigned on consecutive dates, April 25 and 26, 1978. The motion to suppress goes to the suppression of physical and identification evidence and a statement. From the evidence, I have adduced the following pertinent facts:

On November 16, 1976, between the hours of 2:30 and 3:00 p.m., Mrs. McMonagle's residence at 1925 Randolph Street was entered into by a black

youth and she was raped and robbed by him. Immediately after he left, she called the police reporting the rape and robbery and describing her assailant as a young black male, between the ages of 16 and 18, between 5'6" and 5'8" in height, weighing between 140 and 150 pounds, with short cropped hair, without a mustache, glasses or other facial hair, wearing sneakers, dark blue jeans, a black and white striped hooded jacket, over a navy blue shirt, who fled on a bicycle carrying her fur coat on a hanger covered by a white pillow case.

These details were transmitted by police radio and received by Detective Dembeck at 2:50 p.m. Within minutes, Detective Dembeck, from the vantage point of his unmarked car, observed a young black male, who fit the physical description, at the bottom of turned steps in front of 1813 Christian Street. The officer knew the youth's name to be "Darrell" from prior contacts. He was wearing a T-shirt and dark pants, and holding onto a white package and a black and white striped jacket. As a marked police car came by, officer Dembeck observed that defendant ducked furtively behind the shroud of the steps. When he reemerged, the detective commanded him to stop. Instead, discarding the package and the jacket, he fled into 1813 Christian Street. A pillow case containing a fur coat and the striped jacket were retrieved by detective Dembeck.

Premises 1813 Christian Street is a three story multi-dwelling brick building. The dwelling unit on the first floor was locked and inaccessible. On the second floor, there was one locked unit at the head of the stairs. There were two other rooms on the second floor connected by a doorway, which were open and accessible from the hallway. These rooms

were unfurnished, and ostensibly unoccupied. It was in a closet, three feet by three feet, of the middle room that defendant was found by officer Smith. A gold ring was taken from defendant; on the closet floor, after defendant had been removed, the police found two cufflinks.

Defendant was returned to the scene of the crime within a half hour of the incident. Albeit that defendant was in a T-shirt, Mrs. McMonagle immediately recognized him as her assailant. There was no police prompting or suggestions.

By 4:00 p.m., he was at the police station. He was placed in a detention room. The room was 12 feet by 15 feet and had one window, two doors, a desk upon which was a typewriter, and some chairs. Defendant remained in that room until his mother arrived sometime after 5:30 p.m.

Soon after his mother arrived, the police informed both of the charges against defendant, and the Miranda warnings were administered to both, and both participated in the formulation of the responses. After the warnings had been given, defendant and his mother were left alone for ten minutes to further consult and reconsider the decision they had made to waive the right to remain silent and to counsel. Both appeared alert, normal, sound and intelligent. Neither was under the influence of drugs or intoxicants. Both made intelligent and responsive answers.

Between 6:00 and 7:00 p.m., officer Ligato took a statement from defendant in the presence of his mother, while defendant and his mother conferred from time to time. The statement was taken by the officer and typed directly on the typewriter in defendant's words. After the statement was completed, the officer read the statement to them and

then handed it to them with instructions to read and make corrections. Again the officer left the room so as to allow for private consultation between mother and son. Both indicated that the statement was correct and offered no corrections or addendum.

## DISCUSSION

• • •

### 4. Statement

Lastly, defendant moves for the suppression of the statement on the ground (1) that the statement was legally invalid because it was taken in the course of violation of the Juvenile Act of December 6, 1972, P.L. 1464, 11 Pa.C.S.A. §50-318(b) [see section 21(b)] and (2) that the statement was the product of an unnecessary delay between the arrest and delivery to a juvenile detention center as required by 11 Pa.C.S.A. §50-310(a)(3) [section 13(a)(3)].

Section 21(b), 11 Pa.C.S.A. §50-318(b), in part provides that ". . . an extrajudicial statement, if obtained in the course of violation of this act . . . shall not be used against him . . . ." It is argued that section 13(a)(3), 11 Pa.C.S.A. §50-310(c), prohibits the bringing of a juvenile defendant to the station house and that since the statement was procured at the station house in violation of section 13(a)(3), it must be suppressed.

Section 13(a), 11 Pa.C.S.A. §50-310(a) provides: "(a) A person taking a child into custody, with all reasonable speed and without first taking the child elsewhere, shall: (1) Notify the parent . . . of the

child's apprehension and his whereabouts; (2) Release the child to his parents . . . or (3) Bring the child before the court or deliver him to a detention or shelter care facility . . ."

The fallacy of defendant's argument lies in an incorrect interpolation of the statutory text, substituting the word "arrest" for the word "custody." If we take defendant's argument to its logical conclusion, we arrive at the absurd result that, when the officer apprehended defendant inside 1813 Christian Street, he should have, "without taking the child elsewhere . . . notified the parent . . . of the child's *apprehension* and *whereabouts*." See 13(a)(1) (emphasis supplied). There, he was to have waited for the parent and either delivered the child to her or to the shelter center: Section 13(a)(2), (3). While the two words have a common etymology and are commonly used interchangeably without affecting the meaning of the text in which they are used, technically and legally they have their own distinct meanings. Words and phrases that have acquired a technical or peculiar meaning shall be construed according to their technical and peculiar definition: 1 Pa.C.S.A. §1903. The immediate question therefore is—what does the word custody mean in the context of the text of the referenced section?

In arriving at the legislative intent, a statute must be construed so as to give effect to all its provisions; all words and phrases are intended to have a meaning; none are to be treated as surplusage: 1 Pa.C.S.A. 1921(a); Com. v. Hill, 236 Pa. Superior Ct. 572, 346 A. 2d 314 (1975); Appointment of C.P.A. for Hanover Township, 72 D. & C. 2d 758 (1975); Wolfe v. Commonwealth, Department of Transportation, Bureau of Traffic

Safety, 24 Pa. Commonwealth Ct. 261, 355 A. 2d 600 (1976). Every word and phrase must be assigned the meaning plainly intended and which will not lead to an absurd, impossible or unreasonable result: 1 Pa.C.S.A. §§1903(a), 1922(1); Com. v. Horton, 465 Pa. 213, 348 A. 2d 728 (1975); Westinghouse Broadcasting, Inc. v. Commonwealth, Board of Finance and Revenue, 14 Pa. Commonwealth Ct. 59, 321 A. 2d 413 (1974); Commonwealth, Department of Environmental Resources v. Locust Point Quarries, Inc., 27 Pa. Commonwealth Ct. 270, 367 A. 2d 392 (1976).

It is at once notable that the framers of section 13(a) did use the word custody and that not once in the entire text did they use the word arrest. Even where the word arrest might have been used without doing violence to the thought, they used the term apprehension instead: section 13(a)(2). In its contextual sense, the word arrest is not a synonym for the word custody. As we have indicated, to do so would distort the legislative intendment. A word may have different meanings and be substituted by a myriad of synonyms, but its actual meaning in any particular instance can only be derived from the context in which it is used. The word arrest like the term custody is in the general sense a physical restraint, but arrest, unlike custody, constitutes a legal concept. It is an initial legal act which marks the beginning of a criminal prosecution. Custody is a more elastic term; it is not a legal concept. It connotes a more protracted restraint, usually at an enclosed area or place. Taking one into custody means the taking of one to a circumscribed place of restraint, a process that is initiated by a stop or an arrest. This particular definition of the term custody is made clear by the text of section 13 of the

Juvenile Act of December 6, 1972, P.L. 1464, 11 P.S. §50-310(a). That section states that once the child is in *custody*, he shall not be taken *elsewhere*, reflecting the legislature's understanding that "custody" is a phrase to be understood in terms of a *place of confinement*. Then, the person holding the child in custody shall either deliver the child to the parent or take him to a juvenile shelter facility or to court as the case may warrant: 11 P.S. §50-310(a)(1), (2), (3).

The officer in this case did not violate the Juvenile Act by taking defendant to the police station from the arrest scene to await the arrival of the parent.

What remains to be resolved is whether the confession obtained at the station house shall be admissible at trial. As we interpret his position, defendant contends that the Juvenile Act does not authorize any police questioning on the criminal incident.[1]

While our Superior Court has not sanctioned the procedure of taking a juvenile defendant arrested for a crime less than murder[2] to the station house, it

---

1. Reference is made to Com. v. Snelling, C. P. Phila. 1975, Nos. 787-791, opinion, Chalfin, *J.*, June 30, 1976, and A Guide to Pennsylvania Delinquency Law, Packel, 21 Villanova L.R. 32, n. 186 (1975).

2. Under the former Juvenile Act—June 2, 1933, a child charged with murder was triable only in adult court. There was no provision for transfer to the Juvenile Court: Com. v. Pyle, 462 Pa. 613, 342 A. 2d 101, 104 (1976). Under the Juvenile Act of December 6, 1972, delinquent conduct is defined as excluding murder: 11 P.S. §50-102(2); section 7, 11 Pa.C.S.A. §50-303 gives the court authority to transfer the action to Juvenile Court for a hearing: 11 Pa.C.S.A. §50-325; Com. v. Pyle, supra.

has not disapproved of it either. When a child has been brought to the station house after his arrest, the court has not by virtue of that fact alone suppressed the evidence obtained: Anderson Appeal, 227 Pa. Superior Ct. 439, 313 A. 2d 260 (1973); Com. v. Bey, 249 Pa. Superior Ct. 185, 375 A. 2d 1304 (1977). What these decisions have held is that where the child suspect is taken to a station house instead of a juvenile detention center, the child defendant shall be treated like any adult offender. Specifically, he is entitled to an immediate arraignment as required by Pa.R.Crim.P. 130[3] and is entitled to contest evidence flowing from an unnecessary delay. The proper remedy for violation of this rule is to suppress evidence obtained during the unnecessary delay.

Both Anderson and the Bey cases involved juvenile offenders, who, after their arrest, were taken to the station house, where the police obtained evidence from them. In Anderson, the police took a statement; in Bey, defendant was submitted to an identification proceeding. In neither case was the evidence suppressed because it had been obtained at the station house. The Anderson court did not suppress the confession because the police had interrogated defendant at the station house before delivering him to a juvenile detention center or a court; Anderson did not hold that the Juvenile Act forbade all interrogation of juveniles. Rather, the court held that the two and one-half hours delay

_____

3. Pa.R.Crim.P. 130: "When a defendant has been arrested without a warrant in a court case, he shall be taken without unnecessary delay before the proper issuing authority where a complaint shall be filed against him and he shall be given an immediate preliminary arraignment."

between arrest and delivery to the juvenile detention center was not unreasonable or unnecessary: 227 Pa. Superior Ct. at 443, citing Com. v. Futch, 447 Pa. 389, 290 A. 2d 417 (1972), Com. v. Tingle, 451 Pa. 241, 301 A. 2d 701 (1973).

In the instant case, defendant was not taken to the court for an arraignment at all. From the station house, he was taken to a juvenile detention center instead. Thus, it remains to be decided whether this failure makes an otherwise voluntary confession suppressible. The decisional authorities have held that not every piece of evidence procured during a delay in violation of Pa.R.Crim.P. 130 is suppressible, but only that evidence which the court finds is prejudicial and is procured during a period of unnecessary delay and whose procurement is causally related to the delay: Com. v. Futch, supra; Com. v. Tingle, supra; Com. v. Williams, 455 Pa. 569, 572, 319 A. 2d 419, 420 (1974).

Here, the delay was neither unnecessary nor consequential. Defendant was at the police station at 4:00 p.m. where he was held in benign custody to await the arrival of the parent. At about 5:30 p.m., the parent arrived. There was no persistent police interrogation or pressure on either the child or his mother. They were afforded every comfort and courtesy. Their legal rights were solicitously protected by the officer in attendance. From the very beginning, and despite the panoply of legal warnings given to both, they evinced a willingness to make a statement. The questioning, including the giving of the warnings and interludes allowed for consultation, lasted for about one hour. By 7:00 p.m., the statement was completed and defendant was delivered to the Youth Study Center. Under the circumstances, we do not find that there was un-

necessary delay or that the delay of one hour or so, mechanically required for taking of the statement from willing subjects, was the inducement for the statement itself.

For these reasons we deny the motion to suppress.